UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **DAMAIN KEREK** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-76-RLB** |
| **CRAWFORD ELECTRIC SUPPLY COMPANY, INC.** | **CONSENT CASE** |

### MEMORANDUM OF DECISION

This matter was tried before the Court, sitting without a jury, on December 2-4, 2019. Having considered the testimony and evidence presented at trial, the Joint Statement of Established Facts, arguments of counsel, the applicable burden of proof, the post-trial briefing and the applicable law, the Court issues the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

**I.    Background**

On or about December 28, 2017, Damain Kerek ("Plaintiff" or "Kerek") filed this action against his former employer, Crawford Electric Supply Company, Inc. ("Defendant" or "Crawford"), for wages that were allegedly owed to him under a 2016 Bonus Plan. (R. Doc. 1-1 at 3-7). Kerek is seeking recovery of wages, penalties, attorney's fees and costs under the Louisiana Wage Payment Act, La. R.S. 23:631, *et seq.*

Crawford removed the action on the basis that there is diversity jurisdiction under 28 U.S.C. § 1332. (R. Doc. 1). On March 15, 2019, the parties filed a written consent to have a United States Magistrate Judge conduct any and all further proceedings in the case and in accordance with 28 U.S.C. § 636(c), any appeal from judgment would be taken directly to the United States Court of Appeals for the Fifth Circuit. (R. Doc. 11).

1

The three-day bench trial commenced on December 2, 2019 and concluded on December 4, 2019. (R. Docs. 185, 186, 187). Plaintiff has submitted a Post-Trial Memorandum and additional briefing. (R. Docs. 198, 205). Defendant has submitted a Post-Trial Memorandum and additional briefing. (R. Docs. 201, 203, 208).

The Court has considered the credibility of the witnesses presented at trial in resolving contradictions in testimony.

## II.     Findings of Fact

1. In 2013, Kerek was working for Summit Electric Supply as its industrial branch manager in Gonzales, Louisiana. (Dec. 2, Tr. p. 53). He was approached by Kenny DeLaune ("DeLaune"), the Louisiana regional commercial manager for Crawford, another electrical supply company, who stated that Crawford wanted to start a Louisiana industrial branch. (Dec. 2, Tr. pp. 53, 210). On August 2, 2013, Crawford offered Kerek a position as branch manager of a new industrial branch to be located in Baton Rouge, Louisiana. (Plaintiff Ex. 1). The one-page offer of employment provided Kerek with base compensation of $14,584 per month, eligibility for annual management bonuses of potentially up to 100% of his base pay with a guaranteed bonus for 2013 of $115,000, and other employment benefits. The offer of employment did not set a fixed term for Kerek's employment. Kerek signed and returned the letter and went to work for Crawford in August 2013. (Dec. 2, Tr. p. 58).

2. In August 2013, Crawford had two branches in Louisiana – a commercial branch in Baton Rouge and a commercial branch in New Orleans. (Dec. 2, Tr. pp. 65-66, 174-175). Crawford opened an industrial branch in Geismar, Louisiana, in October 2013 (the "Geismar branch"); a Lafayette branch in 2014; and a Lake Charles branch in 2016. (Dec. 2, Tr. pp. 66, 176-177). Kerek was the branch manager at the Geismar branch.

3. Crawford paid Kerek the guaranteed $115,000 bonus in 2013 as promised in the written employment offer. (Dec. 2, Tr. p. 70; Plaintiff Ex. 3). After 2013, Crawford presented Kerek with annual bonus plans. (Joint Ex. Nos. 5, 6, and 7). The 2014, 2015, and 2016 bonus plans detailed the metrics for obtaining a bonus for the respective year. Each of these bonus plans contained a requirement that Kerek must obtain a minimum "ROS" to obtain any bonus payment at all for a particular year.

4. The 2014 Bonus Plan, which Kerek signed, included a 2% ROS threshold. (Joint Ex. 5). Kerek met the 2% ROS threshold and Crawford paid Kerek a bonus of $150,506.88 for 2014. (Joint Ex. 9).

5. The 2015 Bonus Plan, which Kerek signed, included a "breakeven" ROS threshold. (Joint Ex. 6). Kerek met the breakeven ROS threshold and Crawford paid Kerek a bonus of $155,757.12 for 2015. (Joint Ex. 10).

6. The 2016 Bonus Plan included a 3% ROS threshold: "No bonus payments will be made in any category if a minimum 3% ROS is not achieved." (Joint Ex. 7). Kerek testified that he believed the increased ROS was unfair and complained to DeLaune and Crawford's CFO, Director of Finance, Chris Tolle ("Tolle"), but was told that Crawford would not change the plan. (Dec. 2, Tr. pp. 76-78, 224). While there is no written evidence that Kerek signed the 2016 Bonus Plan, Crawford specifically notes in its post-trial briefing that it is not arguing that "there was a lack of contract formation with regard to Kerek's 2016 Bonus Plan." (R. Doc. 201 at 20 n.10). To the extent any dispute remains regarding whether the 2016 Bonus Plan constitutes an enforceable contract governing certain terms of Kerek's employment, the Court accepts as true Kerek's testimony that he actually signed the 2016 Bonus Plan and

3

returned it to DeLaune, and DeLaune cannot recall whether this occurred. (Dec. 2, Tr. pp. 78, 224-225, 227).

7. 2016 was a difficult year for Crawford due to downturns in the oil and gas market, resulting in Crawford's closure of its Lafayette branch. (Dec. 3, Tr. p. 22). Crawford asked its Louisiana branch managers, including Kerek, to reduce expenses and manage costs. (Dec. 3, Tr. 22).

8. In May or June 2016, Crawford entered into a contract with a company named Southwire to establish what has been known in this litigation as the "parallel wire program." (Dec. 2, Tr, pp. 88-90). Parallel wire involves putting three to five colored feeder conductors all of the same length together on one reel for commercial customers. (Dec. 2, Tr. pp. 82-85, 230-231; Dec. 3, Tr. p. 67). Kerek's branch was an industrial branch and did not sell wire for commercial application. (Dec. 2, Tr. p. 231; Dec. 3, Tr. pp. 68-69). Kerek testified that DeLaune told him that the commercial branches needed help from the Geismar branch with storing the parallel wire to be sold by the commercial branches, and that the Geismar branch would have to pay for the wire and equipment to handle it, even though the parallel wire program was primarily for commercial application. (Dec. 2, Tr. p. 92-93). The Geismar branch paid for the purchase of equipment, including approximately $470,000 of feeder cable, and renovations to its warehouse to handle the parallel wire. (Joint Ex. 33; Dec. 2, Tr. pp. 82-83, 86-89, 98, 215, 232-233, Dec. 3, Tr. pp. 29-31).

9. The commercial branches sold some of the parallel wire, but there were few sales. (Dec. 2, Tr. p. 94; Dec. 3, Tr. p. 70). The Geismar branch never sold any of the paralleled wire. (Dec. 2, Tr., p. 93).

10. At the monthly manager meetings attended by the Louisiana branch managers and DeLaune, Kerek complained that his branch was handling and paying all of the costs of the parallel wire program, even though his branch did not sell the parallel wire. (Dec. 2, Tr. pp. 95, 181; Dec. 3, Tr. pp. 14-21). Kerek stated during those meetings that charging his branch for the costs was not fair and that those who were selling the parallel wire should bear the costs. (Dec. 2, Tr. p. 95). The managers discussed various ideas for dealing with the parallel wire program, including: (1) dividing up the costs among the four branches; (2) making the Geismar branch the "pricing branch," whereby the Geismar branch would get credit for all of the sales of parallel wire; and (3) creating a proxy or "ghost" branch within the accounting system to account for the sales and costs of the parallel wire program. (Dec. 2, Tr. pp. 95-96, 98, 181-182, 185-189; Dec. 3, Tr. pp. 82-83).  No agreement was reached on which of the possible options would be implemented at the meetings, and Crawford ultimately made the Geismar branch the pricing branch. (Dec. 2, Tr. 181-183; Dec. 2, Tr. 235-238).  Kerek admitted that it was ultimately Tolle's and DeLaune's decision as to whether a proxy branch would be created and how costs would be allocated to any such proxy branch. (Dec. 2, Tr. p. 96) ("You know . . . that was the best path, but, ultimately, it was Kenny [DeLaune's] and Chris Tolle's decision.").

11. DeLaune testified that it was decided in mid-July to early August 2016 (midway through the first month of the parallel wire program) that the Geismar branch would be the pricing branch for the parallel wire sales and would receive credit for the sales. (Dec. 3, Tr. pp. 46, 60).  DeLaune made Geismar the pricing branch, which meant the Geismar branch would receive credit for the other branch's sales of parallel wire. (Dec. 2, Tr. p. 191-192, 204; Dec. 3, Tr. pp. 62, 82).   Kerek testified that the Geismar branch received credit for the sales of

parallel wire by the commercial branches, which happened on two occasions. (Dec. 2, Tr. pp. 98-100).

12. Kerek testified that while his branch received credit for sales, he was not satisfied with the arrangement and continued to seek allocation of the costs of the parallel wire program to a proxy branch or the other branches. (Dec. 2, Tr. pp. 100-101).  DeLaune told Kerek that he would reach out to Tolle regarding the creation of a proxy branch for allocation of costs of the parallel wire program. (Dec. 2, Tr. p. 97).  DeLaune testified that he asked Tolle on two separate occasions if a proxy branch could be set up; Tolle said that he would look into it, but he never responded to him, so DeLaune dropped the issue. (Dec. 2, Tr. pp. 235-238).  Kerek testified that Delaune and Tolle "were committed" to "doing something" about the parallel wire issue.  (Dec. 2, 101-103, 117).  DeLaune and Tolle did not, however, make any specific promise to allocate the costs of the parallel wire program to a proxy branch and there was no agreement between Kerek and Crawford to modify the terms of the 2016 Bonus Plan to exclude the parallel wire program from the calculation of the ROS.

13. Tolle testified that he has no recollection of DeLaune contacting him regarding the matter, but it was possible that DeLaune discussed the matter with him and it just got dropped. (Dec. 3, Tr. pp. 270-273).  These discussions between DeLaune and Tolle about allocating the costs of the parallel wire program took place after the Geismar branch was named the pricing branch for parallel wire sales. (Dec. 3, Tr. p. 60-62).  Ultimately, Crawford did not allocate any of the costs of the parallel wire program to a proxy branch or the other three branches. (Dec. 2, Tr. p. 238).

14. On September 29, 2016, Kerek forwarded an e-mail to Tolle indicating that the Geismar branch had $457,000 in copper and aluminum wire purchased for the parallel wire program

6

and requested that these costs either (1) be "adjusted out of [his] MWC [managed working capital] calculation <u>at the least</u>" or (2) that a proxy branch be set up to attribute the costs. (Joint Ex. 27) (emphasis added). On October 7, 2016, Tolle responded by stating "We're talking about the best way to do this. We'll do something with it this month." (Joint Ex. 27). Tolle testified that that issue was never addressed. (Dec. 3, Tr. p. 253, 270). Kerek testified that he continued to ask Tolle and DeLaune about the allocation of the expenses for the parallel wire program out of his branch. (Dec. 2, Tr. p. 105-106, 121). Crawford never made any allocation of the costs. (Dec. 2, Tr. p. 105, 214-215).

15. Kerek admits that the monthly financial summaries he received in the year 2016 were showing less than 3% ROS. (Dec. 2, Tr. 191; *see* Joint Exs. 12-22). On December 6, 2016, Crawford provided Kerek a monthly financial summary for November 2016 indicating that the ROS for the Geismar branch was 2.44% (Joint Ex. 22).

16. On January 6, 2017, Kerek's employment was terminated and he was offered a severance package. (Dec. 2, Tr. p. 124; Joint Ex. 36). The severance package provided that Crawford would pay Kerek six months of salary if he would agree not to compete with Crawford in all parishes in Louisiana, and if he would release all claims, including his claim for a bonus. (Joint Ex. 36; Dec. 2, Tr. pp. 125, 223). Kerek testified that he rejected the severance plan because he was confident he would receive a bonus and felt that the non-compete requirement would make him irrelevant in the business. (Dec. 2, Tr. pp. 125).

17. Kerek testified that he did not receive a monthly financial summary for December 2016 prior to his termination. (Dec. 2, Tr. p. 122). The monthly financial summary for December 2016 provides that the final ROS for the Geismar branch in 2016 was 2.86%. (Joint Ex. 23).

18. Ralph Stephens ("Stephens"), Kerek's expert in certified public accounting, forensic accounting, and damages calculations, testified that if cost adjustments attributable to the parallel wire program were made under cost accounting principles, this would reduce the costs incurred by the Geismar branch by $180,000 and result in an ROS between 3.18%-3.21%. (Dec. 3, Tr. 89, 101-102, 119; *see* Plaintiff's Ex. 9). Stephens further testified that assuming the Geismar branch met the 3% ROS requirement, Kerek was entitled to a bonus amount of $112,707.06. (Dec. 3, Tr. p. 127). Stephens calculated the costs attributable to the parallel wire program to be about $180,000 (approximately 4% of the costs recorded for the Geismar branch in 2016) and calculated the ROS of the Geismar branch to be between 3.18%-3.21%. (Dec. 3, Tr. pp. 101-102, 119). Stephens further calculated recoverable wage penalties, if applicable, to be $122,690. (Dec. 3, Tr. p. 127-128). Stephens further testified that there were certain "errors and discrepancies" on Crawford's income statements and balance sheets for 2016, and that these errors and discrepancies caused him concern with respect to Crawford's calculation of the ROS. (Dec. 3, Tr. pp. 94-97).

19. Ronald Gagnet ("Gagnet"), Crawford's expert in certified public accounting, forensic accounting, and damages calculations, testified that having looked at Crawford's financial statements for 2016 he determined that the ROS was 2.86% and Kerek did not meet the 3% requirement. (Dec. 4, Tr. p. 5, 48-49). Gagnet testified that if the Geismar branch met the 3% ROS requirement, Stephen's calculation of the bonus amount would be correct. (Dec. 4, Tr. pp. 52-53).

### III. Conclusions of Law

This is an action for recovery of wages and associated penalties under the Louisiana Wage Payment Act, La. R.S. 23:631, *et seq.* ("LWPA"). "The main purpose of the [LWPA] is to

compel an employer to pay the earned wages of an employee promptly after his dismissal or resignation and to protect discharged Louisiana employees from unfair and dilatory wage practices by employers." *Molina* v. *Oilfield Production Contractors, Inc.*, 241 So.3d 337, 339 (La. App. 1st Cir. 2017). The LWPA provides, in relevant part, the following:

> Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due **under the terms of employment**, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.

La. R.S. 23:631(A)(1)(a) (emphasis added). The LWPA "is directed only at payment, upon termination, of 'agreed-upon' compensation." *Hampton v. McDermott Int'l, Inc.*, No. 19-0200, 2019 WL 5617025, at *3 (W.D. La. Oct. 30, 2019) (citing *Whitworth v. Chiles Offshore Corp.*, No. 92-1504, 1992 WL 245618 at *1 (E.D. La. Sept. 17, 1992) (plaintiffs claim for wages were anything but agreed-upon, making the LWPA inapplicable)). "Whether a bonus constitutes earned wages (or 'amounts then due') under the LWPA is a mixed question of law and fact." *Wiggins v. Coast Proof's, Inc.*, No. 14-0002, 2015 WL 692921, at *8 (W.D. La. Feb. 18, 2015) (citing *Batiansila v. Advanced Cardiovascular Systems, Inc.*, 952 F.2d 893 (5th Cir. 1992)).

An employer who fails or refuses to comply with the provisions of La. R.S. 23:631 shall be liable to the employee for attorney's fees and up to ninety days of penalty wages. La. R.S. 23:632(A). To prove entitlement to attorney's fees and penalty wages under La. R.S. 23:632, the employee must establish: (1) that wages were due and owing, (2) that demand for payment was made at the place where the employee was usually paid, and (3) that the employer failed to pay upon demand.

There is no dispute that the 2016 Bonus Plan constitutes an employment agreement between Kerek and Crawford providing for the payment of certain bonus amounts if, and only if,

9

a "minimum 3% ROS" was achieved with respect to the Geismar branch. Accordingly, the threshold issue is whether Kerek and Crawford reached a subsequent agreement that the costs of the parallel wire program would be excluded from the ROS calculation in the 2016 Bonus Plan. Kerek argues that such an agreement was reached and, given Crawford's failure to exclude the parallel wire program from the ROS calculation, the Court should adopt Stephens' calculations of the ROS and provide recovery under the LWPA. Stephens' calculations provide that, in accordance with cost accounting principles, exclusion of costs associated with the parallel wire program from the Geismar branch ROS would result in Kerek achieving the 3% ROS threshold. In contrast, Crawford argues that the Court need not consider Stephens' calculations of the ROS because Crawford and Kerek never agreed to exclude the parallel wire program from the ROS calculation, much less on the extent of costs that would be excluded.

"An employer/employee relationship is contractual in nature, and the parties may negotiate and agree to any terms not prohibited by law or public policy." *Hampton v. McDermott Int'l, Inc.*, No. 19-0200, 2019 WL 5617025, at *2 (W.D. La. Oct. 30, 2019) (citing *Reed v. Willwoods Cmty.*, 165 So.3d 883, 886-87 (La. 2015)). "Absent a specific contract or agreement establishing a fixed term of employment, an employer is at liberty to dismiss an employee at any time for any reason without incurring liability for the discharge." *Blakemore v. Town of Grambling*, 289 So. 3d 681, 687 (La. App. 2 Cir. 2020). "When the employer and employee are silent on the terms of the employment contract, the civil code provides the default rule of employment-at-will." *Quebedeaux v. Dow Chem. Co.*, 820 So.2d 542, 545 (La. 2002); *see* La. Civ. Code art. 2747 ("A man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reason for so doing. The servant is also free to depart without assigning any cause."). There is no evidence in the record that Kerek's employment with

10

Crawford was for a fixed term or that Crawford could otherwise only terminate Kerek's employment for cause. Accordingly, Kerek was an at-will employee.

The Court finds that the 2016 Bonus Plan constitutes a valid contract providing the "terms of employment" governing the award of a bonus payment if certain metrics are met. This contract provides that Kerek must obtain a 3% ROS for the Geismar branch to obtain any bonus for 2016. Accordingly, Kerek was entitled to a bonus under the 2016 Bonus Plan if the Geismar branch obtained a minimum 3% ROS in the year 2016.[1] The Court will, therefore, consider whether the parties agreed to modify the terms of the 2016 Bonus Plan to exclude certain costs of the parallel wire program from consideration for the calculation of the ROS. This analysis requires a consideration of the law of contract formation and interpretation.

Under Louisiana law, "[a] contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906. There are four elements for a valid contract: (1) capacity to contract; (2) mutual consent; (3) a lawful cause;[2] (4) and an object that is lawful, possible, and determined or determinable. *Granger v. Christus Health Cent. La.,* 144 So.3d 736, 760-61 (La. 2013); *see also* La. Civ. Code arts. 1918, 1927, 1966, 1971. "A contract is formed by the consent of the parties established through offer and acceptance." La. Civ. Code art. 1927. "As such, an offer is an indispensable element of consent and it is of utmost importance to determine whether a certain declaration of wills amounts to a real offer or is merely a declaration made without an intention of becoming bound." *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 602 (E.D. La. 2002).

---

[1] The 2016 Bonus Plan also provides that "All participants must be actively employed at the time the bonuses are paid to be eligible to receive a payout." (Joint Ex. 7). The Court has ruled that this provision violates public policy and that any bonus earned by Kerek in the year 2016 was an "amount then due" under the terms of the 2016 Bonus Plan. *See Kerek* v. *Crawford Elec. Supply Co., Inc.*, No. 18-76-RLB, 2019 WL 721175, (M.D. La. Feb. 20, 2019).
[2] The term "cause" in the context of Louisiana contract law is defined as "the reason why a party obligates himself." La Civ. Code arts. 1966, 1967.

11

"Thus, an enforceable contract requires a meeting of the minds." *Read v. Willwoods Cmty.*, 165 So. 3d 883, 887 (La. 2015). The burden of proving a meeting of the minds with respect to an employment contract falls on the party seeking enforcement of the terms of employment. *Id*. *See* La. Civ. Code art. 1831 ("A party who demands performance of an obligation must prove the existence of the obligation. A party who asserts that an obligation is null, or that it has been modified or extinguished, must prove the facts or acts giving rise to the nullity, modification, or extinction.").

"Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "The language of the policy is the starting point for determining that common intent." *Angus Chem. Co. v. Glendora Plantation, Inc.*, 782 F.3d 175, 180 (5th Cir. 2015) (quoting *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009)). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047. "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code art. 2048.

"A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature

12

between the same parties." La. Civ. Code art. 2053. "Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another. Usage, as intended in the preceding articles, is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." La. Civ. Code art. 2055.

"The determination of whether a contract is clear or ambiguous is a question of law. Moreover, when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate." *Angus Chem. Co.*, 782 F.3d at 180 (quoting *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007)). "The Court may consider extrinsic evidence as to the parties' intent only if the contract is ambiguous." *Thorne v. Bard Peripheral Vascular, Inc.*, No. 16-0262, 2016 WL 3746148, at *4 (E.D. La. July 13, 2016) (citing *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002)).

The plain language of the 2016 Bonus Plan provides that a 3% ROS threshold must be achieved to obtain a bonus: "No bonus payments will be made in any category if a minimum 3% ROS is not achieved." (Joint Ex. 7). There is no dispute that the acronym "ROS" stands for return of sales. Furthermore, there is no dispute that the bonus plans for 2014, 2015, and 2016 required Kerek to obtain a certain ROS with respect to the Geismar branch in the given year to obtain a bonus. If the ROS was achieved, the bonus plans provided additional metrics for determining the specific amount to be awarded. There is no dispute that Crawford calculated the ROS with respect to the 2014 and 2015 bonus plans without any dispute and that Kerek achieved the ROS metrics required in those plans. To the extent there is any ambiguity with respect to the calculation of ROS under the 2016 Bonus Plan, the Court finds that the parties' conduct with

13

respect to the calculation of ROS was to be determined by Crawford, in good faith, under the same accounting methodologies and principles as it was calculated under the 2014 and 2015 bonus plans. *See* La. Civ. Code arts. 2053, 2055.

The testimony and evidence presented at trial provide that the parallel wire program resulted in a new accounting obstacle not specifically addressed in the 2016 Bonus Plan or encountered during the periods of the previous 2014 and 2015 bonus plans. As stated above, the Court interprets the 2016 Bonus Plan to allow Crawford to calculate the ROS under a good faith application of its own accounting methodologies and principles.

The testimony and evidence presented at trial provides that Crawford ultimately made the business decision to designate the Geismar branch as the "pricing branch" with respect to the parallel wire program. Under Crawford's ROS calculation, the Geismar branch received the benefits of any sales of the parallel wire program while maintaining the burden of the costs with respect to the parallel wire program.

While the testimony and evidence presented at trial provide that Kerek complained about this arrangement, and Delaune and Tolle considered the creation of a "proxy" branch to which the costs of the parallel wire program could be allocated, the Court concludes that there was no meeting of the minds between Kerek and Crawford to modify the terms of the 2016 Bonus Plan to remove the parallel wire program from the ROS calculation altogether. The testimony and evidence presented at trial provide that Crawford decided to designate the Geismar branch as the "pricing branch" rather than allocating all profits and costs of the parallel program to the commercial branches or a "proxy" branch.[3] The testimony and evidence presented at trial does

---

[3] Crawford suggests that the parties reached an agreement to amend the 2016 Bonus Plan by designating the Geismar branch as the "pricing" branch. (R. Doc. 201 at 21-23). Regardless of whether the parties reached an agreement to do so, the 2016 Bonus Plan allowed Crawford to make this business decision with respect to how the ROS was to be calculated.

14

not, however, support a finding that the parties had a meeting of the minds with respect to modifying the 2016 Bonus Plan to <u>require</u> Crawford to remove the costs of the parallel wire program from the ROS calculation for the Geismar branch.

Had the parties agreed that the parallel wire program would be excluded from the ROS calculation, the Court would consider Stephens' opinion with respect to the calculation of the ROS with the exclusion of the costs associated with the parallel wire program. Kerek did not present evidence and testimony at trial, however, proving that Crawford calculated the ROS for the Geismar branch in error considering its "pricing branch" decision.

In sum, the Court finds that Kerek has failed to meet his burden of proving that the parties agreed to amend the 2016 Bonus Plan to require exclusion of the parallel wire program from the ROS calculation for the Geismar branch in 2016. Because the ROS was under the required 3%, no bonus was due.

## IV. Conclusion

For the reasons given above, judgment is entered in favor of Crawford, and Kerek's claims are **DISMISSED with prejudice**.

Signed in Baton Rouge, Louisiana, on August 20, 2020.

        **RICHARD L. BOURGEOIS, JR.**
        **UNITED STATES MAGISTRATE JUDGE**

15